IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

PAUL LAVERGNE, et al

Plaintiffs

v.

ATIS CORPORATION, et al

Defendants

**Civil No. 09-1421 (SEC)**

**OPINION AND ORDER**

Pending before this Court are Co-defendant ATIS Corporation ("ATIS"), and its insurer, American International Insurance Company of Puerto Rico ("AIICOPR") (collectively "Atis" or "Defendants") motion to dismiss filed in Civil Cases No. 09-1421 (Dockets ## 12 & 13) and 09-1877 (Dockets ## 9 & 10).[1] Plaintiffs Paul Lavergne, et al (Civil No. 09-1421, Docket # 32), and Gladys Velez, et al (Civil No. 09-1877, Docket # 15) opposed. After reviewing the filings, the applicable law, and holding a hearing, Defendants' motion to dismiss is **GRANTED.**

**Factual and Procedural Background**

On May 12, 2009, Luis Lavergne's relatives[2] ("Lavergne Plaintiffs"), filed the instant complaint against Atis under the Montreal Convention.[3] Civil No. 09-1421, Docket # 1. On July 9, 2009, Atis filed a motion to dismiss for lack of subject-matter jurisdiction. Id. at Dockets ## 12 & 13. Essentially, Atis alleges that the Montreal Convention establishes the liability of commercial air carriers engaged in international flights, and thus is not applicable to private international flights. Also, according to Atis, they have never engaged in the business of transporting passengers for hire. Lastly, Atis contends that insofar as the flight object of the

---

[1] On December 8, 2009, both cases were consolidated. See Civil No. 09-1877(SEC), Docket # 20.

[2] Luis Lavergne's son, Paul Lavergne, on his own behalf and on behalf of his minor son Rene Juan Lavergne-Suarez; Lavergne's daughter, Jeanine Lavergne, on her own behalf and on behalf of her minor daughters Sophie Natalie Uldry-Lavergne and Camil Geraldine Uldry-Lavergne.

[3] Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, ICAO Doc. 9740, reprinted in S. Treaty Doc. No. 106-45, 1999 U.S.T. LEXIS 175.

**CIVIL NO. 09-1421 (SEC)**                                                                    Page 2

present case was a private flight, the purpose of the same was to transport friends, and the deceased passengers did not pay for the flight, the Montreal Convention is inapplicable to the case at bar, depriving this Court of subject-matter jurisdiction.

On July 16, 2009, the Lavergne Plaintiffs filed an amended complaint to include Karen Pizarro-Landrau's relatives[4] ("Pizarro Plaintiffs") as plaintiffs. Civil No. 09-1421, Docket # 15. Shortly thereafter, the Lavergne Plaintiffs moved this Court for a period of four months to conduct discovery exclusively as to whether Atis is a commercial carrier, and whether the passengers paid for the flight in question in order to properly oppose Atis' motion to dismiss. Civil No. 09-1421, Docket # 16. Said request was granted (Civil No. 09-1421, Docket # 21), and on September 30, 2009, they filed their opposition to Defendants' motion to dismiss arguing that Atis' actions fall within the Montreal Convention's scope, and therefore, dismissal is unwarranted (Civil No. 09-1421, Docket # 32).

On February 2, 2010, Plaintiffs filed a second amended complaint to include Alberto Bachman's children, Nicole Bachman-Molina, and Alberto IV Backman-Molina, as plaintiffs, as well as co-defendants Santos Diaz, Omar Diaz-Pabon, Coldwater Holdings, Inc., and Sintex Enterprises, Inc. Civil No. 09-1421, Docket # 58.

Parallel to case 09-1421, on September 2, 2009, Luis Alberto Romero-Encarnación's relatives[5] ("Romero Plaintiffs") filed suit against Atis on the same grounds. Civil No. 09-1877, Docket # 1.[6] On October 13, 2009, Atis moved for dismissal in said case setting forth the same

---

[4] Pizarro's son, Joaquin Pizarro; her parents, Migdalia Landrau-Perez and Jose Joaquin Pizarro Landrau; her sisters Maylin Pizarro Landrau and Audrey Pizarro Landrau; and her ex husband Felix Montalvo, on behalf of their son Felix Daniel Montalvo Pizarro. Pizarro's husband, Luis Espinet Garcia, and their son, Keven Espinet Pizarro were later added as plaintiffs as well. Docket # 61.

[5] Luis Alberto Romero-Encarnacion's widow, Gladys Velez, on her own behalf and on behalf of their minor children Gladys Romero-Velez and Luis A. Romero-Velez; and Romero's sons, Dennis and Jonathan Romero.

[6] Although the Romero Plaintiffs also assert diversity jurisdiction, some Plaintiffs and Defendants are Puerto Rico residents. "Diversity jurisdiction exists only when there is *complete* diversity, that is, when no plaintiff is a citizen of the same state as any defendant." Gabriel v. Preble,

**CIVIL NO. 09-1421 (SEC)**                                                                                         Page 3

arguments as in Civil Case No. 09-1421. Civil Case No. 09-1877, Dockets ## 9 & 10. On October 28, 2009, the Romero Plaintiffs filed their opposition to Atis' motion to dismiss. Civil No. 09-1877, Docket # 15. They further filed an amended complaint to include claims against co-defendants Santos Diaz, Omar Diaz-Pabon, Coldwater Holdings and Sintex Enterprises. Civil No. 09-1877, Docket # 21. In light of the common issues of law and fact raised by plaintiffs in both cases, on December 8, 2009, the cases were consolidated. See Civil No. 09-1877, Docket # 20. Co-defendants Diaz-Pabon, Sintex, Coldwater and Santos Diaz filed motions joining Atis' request for dismissal. See Civil No. 09-1421, Dockets ## 82, 101 & 102.

According to the complaints, on February 8, 2009, Lavergne, Romero, Bachman and Pizarro arranged for transportation with Atis Corporation from Casa de Campo International Airport in La Romana, Dominican Republic, to the Fernando Dominicci Airport in San Juan (Isla Grande Airport). Due to severe weather conditions, the aircraft spiraled towards the water, and all passengers died upon impact. As a result, Lavergne, Romero, Bachman and Pizarro's relatives filed these suits seeking damages for the wrongful death of said passengers, as well as their own pain and suffering pursuant to the Montreal Convention.

Due to the jurisdictional issues raised in Atis' motion to dismiss and the factual controversies affecting a determination on this matter, an Evidentiary Hearing was held on February 4, 2011. Docket # 129.

**Standard of Review**

*Fed. R. Civ. P. 12(b)(1)*

Rule 12(b)(1) is the proper vehicle for challenging a court's subject matter jurisdiction. Valentín v. Hospital Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001). Under this rule, a wide variety of challenges to the Court's subject matter jurisdiction may be asserted, among them those based on sovereign immunity, ripeness, mootness, and the existence of a federal question. Id. (citations omitted); see also Hernández-Santiago v. Ecolab, Inc., 397 F.3d 30, 33 (1st Cir.

---

396 F.3d 10, 13 (1st Cir. 2005)(italics in original). The presence of one non-diverse party divests the district court of jurisdiction over the entire case. Olympic Mills Corp. v. DDC Operating, Inc., 477 F.3d 1, 6 (1st Cir. 2007). Therefore, complete diversity is lacking in this case.

**CIVIL NO. 09-1421 (SEC)**                                                          Page 4

2005) (discussing application of Rule 12(b)(1) challenge in cases where the court allegedly has diversity jurisdiction). Justiciability is a component of a court's subject matter jurisdiction, and, as such, must be reviewed following Rule 12(b)(1)'s standards. Sumitomo v. Quantum, 434 F. Supp. 2d 93 (D.P.R. 2006). A court faced with a Rule 12(b)(1) motion should give it preference. Dynamic Image Technologies, Inc. v. U.S., 221 F. 3d 34, 37 (1st Cir. 2000).

A plaintiff faced with a motion to dismiss for lack of subject matter jurisdiction has the burden to demonstrate that such jurisdiction exists. See Lord v. Casco Bay Weekly, Inc., 789 F. Supp. 32, 33 (D. Me. 1992); see also SURCCO V. PRASA, 157 F. Supp. 2d 160, 163 (D. P.R. 2001). In this context, a court is empowered to resolve factual disputes by making reference to evidence in the record, beyond the plaintiff's allegations, without having to convert the motion to dismiss into one for summary judgment. Id. Moreover, "[w]here a party challenges the accuracy of the pleaded jurisdictional facts, the court may conduct a broad inquiry, taking evidence and making findings of fact." Hernández-Santiago v. Ecolab, Inc., 397 F. 3d 30 (1st Cir. 2005). Therefore, the court may consider extrinsic materials, "and, to the extent it engages in jurisdictional fact-finding, is free to test the truthfulness of the plaintiff's allegations." Dynamic, 221 F. 3d at 38. That is, the principle of conversion of a motion to dismiss into a motion for summary judgment when extrinsic materials are reviewed, does not apply in regards to a motion to dismiss for lack of subject matter jurisdiction. Id.

**Applicable Law and Analysis**

Prior to 2003, "a complex interplay of conventions, treaties and domestic laws governed international air carrier liability." Sompo Japan Insurance, Inc. v. Nippon Cargo Airlines Co., Ltd., 522 F.3d 776, 780 (7th Cir. 2008). The Montreal Convention "was the product of a United Nations effort to reform the Warsaw Convention[7] 'so as to harmonize the hodgepodge of supplementary amendments and intercarrier agreements of which the Warsaw Convention system of liability consists.'" Id. (quoting Ehrlich v. American Airlines, Inc., 360 F.3d 366, 371

---

[7] The Warsaw Convention is formally known as the Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934).

n. 4 (2nd Cir. 2004)). In 1999, fifty-two countries, including the United States, signed the treaty. Id. It was ratified by the United States in 2003, and entered into force on September 5, 2003. Id. at 781.

Courts have explained that "[t]he Montreal Convention is not an amendment to the Warsaw Convention ... but an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention." Ehrlich, 360 F.3d at 371. Thus the treaty unifies and replaces Warsaw Convention's liability scheme, in addition to recognizing "the importance of ensuring protection of the interests of consumers in international carriage by air, and the need for equitable compensation based on the principle of restitution." Id. (citing Montreal Convention Preamble). In sum, the Montreal Convention attempts to "balance the interests of air carriers and potential plaintiffs," "by limiting air carriers' potential liability to predictable, non-catastrophic damages and also by preserving a plaintiff's right to recover its losses up to a certain amount." Sompo, 522 F.3d at 781 & 789. Notwithstanding, although this Convention "seems to have reversed one of the premises of the original Warsaw Convention, which favored the airlines at the expense of consumers," it did not "alter the original Warsaw Convention's goal of maintaining limited and predictable damage amounts for airlines." Id. at 781; see also Ehrlich, 360 F.3d at 371 n.4.

As to the Warsaw Convention's scope of application, Article 1.1 provided:

> This convention shall apply to all international transportation of persons, baggage or goods performed by aircraft for hire. It applies equally to gratuitous transportation by aircraft performed by an air transport *enterprise*.

(Emphasis added). This article remained basically unaltered in Article 1(1) of the Montreal Convention, which states:

> This convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward. It applies equally to gratuitous carriage by aircraft performed by an air transport *undertaking*.

(Emphasis added)

In their motion to dismiss, Defendants posit that the Montreal Convention, like its predecessor, only applies to commercial international flights. They contend that the wording

variations between Article 1(1) of the Montreal Convention and Article 1.1 of the Warsaw Convention are due to French-English translation differences that do not substantively affect their scope. Specifically, they posit that the second sentence in Article 1(1) does not extend the Montreal Convention's coverage to gratuitous private flights. Specifically, they posit that the concepts of air transport "undertaking" and "enterprise" both refer to air transport businesses, not private flights carried out for friends. Citing case law under the Warsaw Convention, Defendants argue that Article 1(1)'s language regarding "gratuitous carriage by aircraft performed by an air transport undertaking" refers to the gratuitous carriage of passengers in a commercial aircraft performed by an air transport business, such as an airline's deadheading employees. They further point out that the purpose of the flight object of this suit was to transport friends who did not pay for the same. Moreover, Atis avers that they never transported passengers for hire. As a matter of fact, the aircraft owned by them were operated as general aviation aircraft under Part 91 of the Federal Aviation Regulations, that is, for personal and private use. As such, they contend that the Montreal Convention is inapplicable to the case at bar.

In opposition, Plaintiffs argue that Defendants' motions to dismiss are "premised on the incorrect proposition that the terms of the Montreal Convention are the same as those of the treaty which it substituted, the Warsaw Convention." Civil No. 09-1241, Docket # 32 at 3. According to Plaintiffs, there are major differences between the Montreal and Warsaw Conventions' purposes. Specifically, they point out that the Warsaw Convention sought to "limit the liability of air carriers in order to foster the growth of the fledgling commercial aviation industry," whereas the Montreal Convention seeks to ensure the protection of passengers and consumers in international carriage by air. See id. at 4. Plaintiffs further contend that a comparison of Article 1.1 of the Montreal Convention, and Article 1(1) of the Warsaw Convention shows that the latter is limited to commercial airlines, while the former may encompass private flights such as the one object of this case. In support of this argument, Plaintiffs posit that the change from "air transport enterprise" to "air transport undertaking"

dramatically changes the focus of the Montreal Convention. Specifically, they contend that it extends the Montreal Convention's coverage to international air carriage performed gratuitously by private corporations and private aircraft such as the one in this case. On this point, Plaintiffs note that although the Montreal Convention does not define an "air transport undertaking," Article 2.1 provides that the Convention applies to carriage performed by the State and by legally constituted public bodies that fall within the conditions of Article 1, which could be interpreted as including private flights. Thus Plaintiffs reason that the Montreal Convention includes gratuitous carriage by aircraft performed by the State, by legally constituted public bodies and private entities such as Atis.

Pursuant to the filings, and the testimony heard during the evidentiary hearing, it is uncontested that Lavergne, Romero, Bachman and Pizarro did not pay to be transported from La Romana to Puerto Rico. They were transported as a favor for Ralph Christiansen,[8] a friend of Diaz-Pabon and Santos Diaz. Moreover, there is no controversy as to the fact that ATIS and Diaz Pabon paid for all of the flight's costs and fees. Therefore, the pivotal issue to be determined in this case is whether Atis acted as an "air transport undertaking" as defined in Article 1(1) of the Montreal Convention when it provided gratuitous carriage to the deceased passengers.

Although there is ample case law regarding the Warsaw and Montreal Conventions, courts have yet to expressly address the particular controversy raised in this case. In fact, this Circuit has yet to address any issues regarding the Montreal Convention. The Supreme Court has held that the interpretation of an international treaty begins with the language of the treaty unless such language effects a result inconsistent with the parties' intentions. Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 180 (1982) (finding that "clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories'"); Medellin v. Texas, 552 U.S. 491 (2008) (holding that the "interpretation of a treaty, like the

---

[8] Christiansen also died in the plane crash.

**CIVIL NO. 09-1421 (SEC)**                                                                 Page 8

interpretation of a statute, begins with its text"); Ehrlich, 360 F.3d at 375 (holding that interpretation of treaty begins "with the text of the treaty and the context in which the written words are used"). However, "treaties are construed more liberally than private agreements, and to ascertain their meaning" a court "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." Eastern Airlines v. Floyd, 499 U.S. 530, 535 (1991) (citing Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-432 (1943); Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196 (1999) (finding that courts may look "beyond the written words to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties'"); El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 167 (1999). The Executive Branch's understanding of treaty obligations is also afforded "considerable weight." Medellin v. Dretke, 544 U.S. 660, 685 (2005); see also Baah v. Virgin Atlantic Airways, Ltd., 473 F. Supp. 2d 591, 596 (S.D.N.Y. 2007).

Although as previously stated, the Montreal Convention is "an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention," Ehrlich, 360 F.3d at 371 n. 4, many of "the provisions of the Montreal Convention are taken directly from the Warsaw Convention and the many amendments thereto." Best v. BWIA West Indies Airways Ltd., 581 F. Supp.2d 359, 362 (E.D.N.Y. 2008). As a result, case law interpreting provisions of the Warsaw Convention has been applied to cases interpreting "substantively similar" provisions of the Convention. See id.; Gustafson v. Am. Airlines, Inc., 658 F. Supp. 2d 276, 282 (D. Mass. 2009); Baah, 473 F. Supp.2d at 596-97; Hutchinson v. British Airways PLC, No. 08-2781, slip op. at 3 (E.D.N.Y. April 6, 2009) (holding that courts rely "on cases interpreting a provision of the Warsaw Convention where the equivalent provision in the Montreal Convention was substantively the same"); Ugaz v. American Airlines, Inc., 576 F. Supp. 2d 1354, 1360 (S.D.Fl. 2008) (relying on cases interpreting the "Warsaw [C]onvention where the equivalent provision of the Montreal Convention is substantively the same").

**CIVIL NO. 09-1421 (SEC)**                                                                                      Page 9

The Senate Foreign Relations Committee addressed the Montreal Convention's drafting history with respect to the continued applicability of judicial decisions interpreting the Warsaw Convention:

> [i]n the nearly seventy years that the Warsaw Convention has been in effect, a large body of judicial precedent has been established in the United States. The negotiators of the Montreal Convention intended to preserve these precedents. According to the Executive Branch testimony, '[w]hile the Montreal Convention provides essential improvements upon the Warsaw Convention and its related protocols, efforts were made in the negotiations and drafting to retain existing language and substance of other provisions to preserve judicial precedent relating to other aspects of the Warsaw Convention, in order to avoid unnecessary litigation over issues already decided by the courts under the Warsaw Convention and its related protocols.'

Baah, 473 F. Supp.2d at 596. Accordingly, courts may rely on cases interpreting a provision of the Warsaw Convention where the equivalent provision in the Montreal Convention was substantively the same. Id.

Upon examining the text of the treaties, this Court notes that Article 1.1 of the Warsaw Convention remained basically unaltered in the Montreal Convention. As previously stated, Article 1(1) of the Montreal Convention states

> This convention applies to all international carriage of persons, baggage or cargo performed by aircraft for reward. It applies equally to gratuitous carriage by aircraft performed by an air transport *undertaking.*

(Emphasis added)

This provision is virtually identical to Article 1.1 of the Warsaw Convention, which provides:

> This convention shall apply to all international transportation of persons, baggage or goods performed by aircraft for hire. It applies equally to gratuitous transportation by aircraft performed by an air transport *enterprise.*

49 U.S.C. § 40105 (emphasis added). The change of the word "enterprise" to the word "undertaking" is of particular relevance in analyzing Atis' motion, since each party attributes differing significance to such change. According to Collins-Robert French-English Dictionary, the french word "entreprise," used in both conventions' original text translates to "undertaking," "enterprise," and "firm," among other definitions, in the English language. See Collins-Robert French-English Dictionary 254 (1978). The Oxford Dictionary and Thesaurus, 480 & 1668

(American ed. 1996), in turn, defines "enterprise" as "an undertaking" or "business firm," while undertaking is defined as "an enterprise" or "business." In sum, both terms in the English language refer to a business. Accordingly, we find that there is no substantial change in the meaning of the provisions after their translation to English insofar as both refer to gratuitous carriage performed by a company or legally constituted body in the air transport business. In light of the similarity amongst these articles, case law interpreting the Warsaw provision is binding precedent when analyzing Article 1(1) of the Montreal Convention.

When discussing the matter of "gratuitous carriage by aircraft performed by an air transport undertaking," courts have mostly focused on what persons the convention covers when it refers to gratuitous carriage of passengers in commercial aircraft. The Second Circuit noted that "passenger" status under the Convention does not require a fare paying traveler insofar as Article 1(1) applies to gratuitous travel. See Sulewski v. Federal Express, 933 F.2d 180 (2nd Cir. 1991). Accordingly, the court held that a deadheading employee, *i.e.*, returning home from work duties or flying to a work duty assignment but not obligated to be on the flight, was a passenger insofar as he "would have been on the flight primarily for the purpose of going from point A to point B, not because his employer required him to be on the plane." See id. at 186. Conversely, the Convention is inapplicable to a passenger assigned to a particular flight for work duties. Id.; see also 1-10 Aviation Accident Law § 10.04 (3)(a)(Matthew Bender). Nevertheless, said case does not provide guidance for the present controversy since there was no dispute as to the fact that the flight in *Sulewski* was conducted as part of an air transport business.

Only the Fifth Circuit has discussed, in passing, the possible interpretation of the phrase "gratuitous transportation by aircraft performed by an air transport undertaking" as it pertains to private flights. See Block v. Compangie Nationale Air France, 386 F.2d 323, n. 30 (5th Cir. 1967). In *Block*, the court noted that the object of this provision was to "exclude the application of the [Warsaw] Convention to casual, isolated flights when a free ride is afforded by an owner not engaged in the business (enterprise) of flying."Id. This finding follows the "convention's

underlying purpose [] to regulate and unify rules of liability applicable to international airlines, not as tort reform for aviation in general." 1-10 Aviation Accident Law § 10.04 (3)(b)(Matthew Bender).

As previously explained, it is uncontested that the deceased passengers did not pay a fare to be transported by Atis. Moreover, Plaintiffs in this case do not dispute that ATIS operated under Part 91 of the Federal Aviation Regulations, which governs flight operations conducted for personal use. Instead, they argue that Atis was created for the sole purpose of eventually conducting an air transport business and that Atis was exploring the possibility of obtaining a certification under Part 135 in order to charge passengers for air transportation and generate income. As a result, according to Plaintiffs, Atis operated as an air transport undertaking. Notwithstanding, pursuant to Diaz-Pabon's testimony, Atis was created to own two aircraft used for private flights between Puerto Rico and the Dominican Republic, to transport himself and his father to the Dominican Republic, where Diaz-Pabon's father remodeled privately owned vacation properties, developed apartment projects and owned properties. That is, the planes were not used for commercial purposes. Specifically, he noted that they only transported friends and family, not business related persons such as investors or bankers. Moreover, Atis was not certified under Part 135 at the time of the accident and did not charge passengers for the transportation. All of the expenses incurred by Atis were paid for by loans obtained from Coldwater Holdings, a corporation owed by his father, Santos Diaz. Although Atis hoped to obtain a certification under Part 135 in order to pay back those loans, they never obtained said certification nor transported passengers for hire.

Based on the foregoing facts, this Court finds that Atis did not operate as an air transport undertaking at the time of the accident. Moreover, Plaintiffs have failed to provide relevant case law showing that the changes effected in the Montreal Convention extend its scope beyond the commercial realm and into private flights conducted by companies that are not in the air transport business. Although Plaintiffs focus on whether the Montreal Convention covers private flights such as the one in this case, our analysis cannot merely rest on semantical

**CIVIL NO. 09-1421 (SEC)**                                                                                    Page 12

analysis of the words enterprise and undertaking instead of a factual determination about Atis' operations. More so considering that, as we previously held, said language does not extend the Montreal Convention's scope as Plaintiffs suggest.

Lastly, this Court notes that Plaintiffs' reliance on Thomas J. Whalen's article[9] is misplaced insofar as it is not binding precedent. Most importantly, the article was written in 2000, a mere year after the Montreal Convention was signed, prior to its ratification by the United States and to the case law that followed its ratification. Specifically, federal courts have consistently emphasized that the Montreal Convention did not replace the Warsaw Convention. As a result, its ratification did not overturn case law interpreting the Warsaw Convention insofar as the Montreal Convention largely preserved the former's language and scope.

Additionally, Whalen's argument does not necessarily advance Plaintiffs' position. The author states that "[t]he word 'enterprise' in the Warsaw Convention would apply to an airline (an air transport enterprise), but most likely would not apply to an air transport operation of a company which is not an airline." Thus while the language "undertaking" could cover private companies such as IBM which flies its customers from New York to Toronto, such flight would not be covered by the term "enterprise" under the Warsaw Convention. Id. Whalen's proposition rests on alleged differing definitions of the word enterprise and undertaking. As previously held, however, we are not convinced that these words expand the Montreal Convention's scope in such a drastic way. First, the purpose of the Montreal Convention never shifted from the international and commercial realm. Instead, it sought to modernize and consolidate the Warsaw Convention's liability scheme in addition to ensuring the protection of consumers' interests. Second, the term enterprise is defined as "an undertaking" or "business firm," while undertaking is defined as "an enterprise" or "business." Oxford Dictionary and Thesaurus, 480 & 1668 (American ed. 1996). Therefore, under either term, Article 1.1 clearly refers to a business

---

[9] Thomas J. Whalen, *The New Warsaw Convention: The Montreal Convention*, 25 Air & Space L. 12, 15 (2000).

**CIVIL NO. 09-1421 (SEC)**                                                                 **Page 13**

dedicated to air transport, which once again leads us to the pivotal issue in this case, whether Atis was an air transport undertaking, and which we have answered in the negative.

**Conclusion**

Based on the foregoing, Defendants' motion to dismiss is **GRANTED**. Accordingly, Plaintiffs' claims under the Montreal Convention are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of March, 2011.

*S/Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge